Filed 1/26/26  P. v. Garcia CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>AGUSTIN GARCIA,<br><br>Defendant and Appellant. | F088972<br><br>(Super. Ct. No. MCR053456)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Madera County.  Sosi Chitakian Vogt, Judge.

Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Amanda D. Cary and Christina Hitomi Simpson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Appellant Agustin Garcia challenges the trial court's denial of his motion for a new trial after he was convicted of several crimes related to sexual acts committed upon his daughter. We reject his contentions and affirm the judgment.

**BACKGROUND**

In an amended information filed July 2, 2019, the Madera County District Attorney charged Garcia with two counts of lewd and lascivious acts upon a child under the age of 14 years (counts 1 and 2; § 288, subd. (a)), misdemeanor annoying or molesting a child under 18 years of age (count 3, § 647.6, subd. (a)(1)), and lewd acts on a child under 16 years of age and more than 10 years younger than the defendant (count 4, § 288, subd. (c)(1)). A jury found Garcia guilty on all counts on August 1, 2019.

Garcia subsequently filed a motion for new trial, which was denied by the trial court.

The court sentenced Garcia to an aggregate term of 10 years eight months in state prison, calculated as follows: the upper term of eight years for lewd and lascivious acts upon a child under the age of 14 years (count 1; § 288, subd. (a)), plus two years (one-third the midterm of six years) for lewd and lascivious acts upon a child under the age of 14 years (count 2; § 288, subd. (a)), and eight months (one-third the midterm of two years) for lewd acts on a child (count 4; § 288, subd. (c)(1)). Garcia was sentenced to 364 days with credit for time served on count 3.

Garcia appealed. We rejected several of his claims, but accepted a concession from the Attorney General that the trial court applied the wrong standard in denying Garcia's motion for new trial. (*People v. Garcia* (Oct. 24, 2022, F082051) [nonpub. opn.] (*Garcia I*).) We remanded for the trial court to reconsider the motion under the proper standard, and to resentence defendant under then-recent legislation, Senate Bill No. 567 (2021-2022 Reg. Sess.). (*Ibid.*)

On remand, Garcia filed a second new trial motion, which the court denied. The court sentenced Garcia as follows: a six-year term on count 1, plus a consecutive two-

year term on count 2, plus a consecutive eight-month term on count 4. On count 3, the court sentenced Garcia to the "time served" in the Madera County Department of Corrections (364 days with 182 days of actual credits and 182 days of conduct credits). Garcia again appeals.

## FACTS[1]

### A. Initial Report of Sexual Molestation Committed by Garcia

Garcia and his wife, Maria G., lived in Madera and had five children: V.G., K.G., J.G., JC.G., and B.G. Maria G. passed away on February 24, 2012, after a hospitalization lasting approximately two weeks; she died of cardiac arrest from a congenital condition.

Garcia's daughter, K.G., was the complaining witness in this matter. K.G. was born in March 1999 and was 12, going on 13, years old when her mother died. The instant charges relate to Garcia's molestation of K.G. when she was approximately 13 to 15 years old. The molestation started when Maria G. was hospitalized for her fatal illness in 2012, and ended when K.G. reported it to authorities in 2014. By the time the matter proceeded to trial in July 2019, K.G. was 20 years old.

The events that led to the filing of the instant case date to October 8, 2014, when 15-year-old K.G. and her 17-year-old brother V.G. came to the Madera Police Department. They were eventually interviewed by Madera Police Officer Steven Sisemore. K.G. was sad and crying. She said her father, Garcia, had touched her inappropriately and offered to pay her for sex.

Officer Sisemore's October 8, 2014 interview with K.G. was played for the jury. K.G. told Officer Sisemore that her father began touching her inappropriately while her mother was in the hospital (the latter died a few days later). The family was living on Austin Street in Madera at the time.

---

[1] The facts are taken directly from our opinion in *Garcia I*.

Two months after K.G.'s mother died, Garcia began frequenting bars. K.G. told Officer Sisemore: "[Garcia] started going out to the bars and he wouldn't get home 'til like, 2:00 and, like, that's when he would, like, wake me up to heat up his food and that's when he would, like, touch me and stuff, like, more. Like, he would hit my – my butt." K.G. would "push him away or tell him to stop."

K.G. said that "more stuff would happen." She noted: "[Garcia] would tell me, like, that if I would let him do stuff to me that he would let me spend the night at my friend's house." K.G. "would tell him then, 'No,' he was dumb or he was stupid." Garcia would offer K.G. money for doing "intimate stuff" with him. K.G. noted: "He ... would tell me that if I would, um, if I would let – let him do this or that or and, like, whatever he asked me to do that he would give me more money." Garcia would rub K.G.'s leg and ask her to let him touch her. He asked her to have sex with him and offered to let her go out or stay over at her friend's house in return.

K.G. would not allow Garcia to touch her, but she said: "[H]e would touch my [private] parts without, like, me letting him. It would be in the night." This happened "a lot." Garcia would try to slide his hand into K.G.'s pants. K.G. would wake up and tell him to stop. She added: "[A]fterwards, like, it started going little by little and then it ex – started expanding to in, like a whole different (unintelligible). He would ask me for my underwears after this and then I would tell him to leave me alone and he refused many times. Then, like, he sometimes he would just, like, go in – in through my stuff." Garcia would also press his pelvic area against K.G.'s bottom when she was washing dishes. K.G. would turn around right away.

K.G. confronted Garcia and pointed out that her friend's dad would not do sexual things to his daughter and asked why Garcia could not be like her friend's dad. Garcia reprimanded K.G. and said: " 'I'm not even doing anything to you. I already explained that when I fuckin' find a lady I'mma leave you the fuck alone.' " K.G. asked, " 'Why

4.

can't you leave me alone now?' " Garcia would hit K.G. and "smack [her] on [her] head and on [her] back" when she refused to engage in sexual acts with him.

In March 2014, the family moved to Daulton Street in Madera. Garcia continued to molest K.G. at the Daulton Street house as well. He tried to touch K.G. many times, but K.G. would resist; he would basically try every weekend. K.G. asked Garcia whether she could paint her room at the Daulton Street house; Garcia replied he would let her if she let him touch her. If K.G. wanted a mattress and other things, Garcia would say, " 'You know what to do.' " K.G. said: "[W]hen we finally did get a couch, um, I would be watching TV and he would walk by and he would, um, drop his pants in front of me and he wouldn't be wearing underwear.... [¶] ... [¶] And he would say that supposedly that they didn't fit him and to 'look, look K.G.' " K.G. would respond, " 'You're so nasty.' Like, 'Get away from me.' And he would be li-he would just ... walk away laughing." At times when K.G. watched TV, Garcia would try to massage her back or he would sit on her, forcing her to move or to kick him away.

K.G. said: "[The things he did were] just disgusting 'cause he's my dad. And then I just, like, always ask him why he couldn't stop but he's, like, he doesn't care. And then, um, so when I finally got a lock for my room because at that house I didn't have one even and he was like, 'Why the fuck are you locking your room? Like, why?' And then I was, like, 'Because I can and I want my privacy.' And then, um, what's it called? I would always find my underwear in his room and then he was saying that it would be the dog.' " K.G. added: "I got my lock over the summer – he would um, he'd always go into my room every single night and take off my blanket. Not every single night, but every – every Thursday and Saturday that he ... [¶] ... [¶] goes out [drinking]." K.G. got the lock in late July or early August 2014, and the lock led to some reduction in the frequency of the acts of molestation.

5.

**B. Investigation into the Molestation Allegations**

*(i) Testimony of Madera County Social Worker Veronica Pleitez*

Veronica Pleitez, a Madera County Child Welfare Services social worker, met with K.G. and V.G. at the police department, after K.G. had talked with Officer Sisemore. Pleitez interviewed K.G. and V.G. K.G. was "in pieces," meaning she was distraught, emotional, crying hysterically, and clinging to V.G., who was comforting her. K.G. revealed she had been sexually molested and fondled by her father. She had disclosed the situation to V.G., who made arrangements to move her out of the house for a short period. K.G. told Pleitez, " 'I don't want to go through [this] anymore. I want to be free from any molest.' " V.G. was also "very emotional" and "very upset." V.G. said he had learned about the abuse from K.G. in July 2014, arranged for her to move for a limited time, confronted his dad, and warned him to stop. K.G. was 15 years old and V.G. 17, at the time of these events.

Pleitez and Officer Sisemore arranged to immediately remove all five children from the home they shared with Garcia, while the matter was investigated. The children were placed with a relative.

The following day, October 9, 2014, Pleitez met with K.G. at a relative's house. Pleitez testified: "[K.G.] again became very emotional, sharing with me that her mother ha[d] passed away. And that when her mother was – after her mother passed away, the abuse began by her father. [¶] ... [¶] In my recollection, she stated that it happened even when her mother was still in the hospital." Pleitez noted that K.G. told her, "[t]hat her father would make advances – sexual advances on her, that he would attempt to touch her by running his hand all through his leg – or her leg up to the points where her shorts were and try to insert his hand into her shorts." Pleitez continued: "[K.G.] made statements that she would be cooking or washing dishes and her dad would approach her and would come behind her and grab her and touch her in her private areas, her breasts, and her vaginal area." Pleitez added: "She described that her dad would put his hand on her

6.

vaginal area and press hard on her vaginal part, that she would feel the pressure onto her vaginal area." K.G. mentioned Garcia would also push against her with his body "to the point that she felt his private."

K.G. would tell Garcia, " 'This is not right. This is disgusting. Don't do it.' " Garcia would respond, " 'I am not.' " He would laugh in a sarcastic manner and, at one point, said he would stop when he found himself a woman.

Pleitez testified that K.G. mentioned her father would tell her she could spend time with her friend, Vanessa, were K.G. to accept his sexual advances. K.G. also noted she would find her underwear, soiled with semen, in Garcia's laundry basket.

The abuse occurred at two residences, the one on Austin Street and the one on Daulton Street, and took place from the time her mother was hospitalized until the day before K.G. reported it to the police. In the last incident, which occurred on October 7, 2014, Garcia came home drunk and made advances on K.G. K.G. went in her room; Garcia pounded on her locked bedroom door, demanding she open the door. K.G. refused to open it. K.G. stated the abuse disgusted her and made her feel dirty, to the point she had contemplated suicide.

### (ii) Forensic Interview of K.G. Conducted by Angelica Limon

On October 9, 2014, Angelica Limon conducted a forensic interview of K.G. A recording of the interview was played for the jury; we will summarize the contents of the interview.

The abuse by Garcia began three days before K.G.'s mother died. K.G. (who was approximately 13 years old at the time) was sitting on a bed with Garcia, at the Austin Street house. K.G. was crying about her mother dying. Garcia slid his hand along K.G.'s leg up towards her shorts. K.G. asked, "What are you doing?" Garcia told her not to worry and gave her a hug. K.G. got up and left the room; she was crying. K.G. said, "And then after that like things started happening to me (unintelligible)." She said, "it

started going slowly and slowly and slowly until – until I just – I started questioning why do you this?" In the beginning, Garcia would walk away when K.G. would question him.

Over time, the sexual advances started occurring on a daily basis. K.G. said: "I would be washing dishes like sometimes he would come and like squish his – like squish himself towards me so that I like – would [¶] ... [¶] feel parts like on my back [¶] ... [¶] [h]is private parts." When Garcia noticed that K.G. and her friend, Vanessa, were getting really close, he would tell K.G. she could spend the night at her friend's house if she would "jack[ ] [him] off." He would stare at K.G.'s private parts when he said this. Later, Garcia ruined K.G.'s relationship with Vanessa, because he offered Vanessa $20 to do "stuff" with him. K.G.'s cousin, Jonathan, interrupted Garcia's advances on Vanessa in the restroom; Garcia pretended nothing was going on and walked out. Vanessa told K.G.'s aunt (Garcia's sister) about Garcia's actions, but the aunt laughed at Vanessa. The reaction of K.G.'s aunt made K.G. reluctant to tell her aunt about Garcia's conduct with K.G. herself, because K.G. was afraid her aunt would laugh at her as well.

After one awful incident, when Garcia came up behind K.G. when she was folding clothes, pushed her against a cabinet, and squished himself against her, with K.G. finally fighting him off, K.G. told her cousin, C.G., about her father's conduct. C.G. asked, " 'Is he doing it when he's drunk?' " K.G. responded, " 'No he does it whenever.' " C.G. urged K.G. to tell C.G.'s mother, K.G.'s aunt (Garcia's sister). K.G. said in her forensic interview: "I still didn't have the guts to do it. And I told [C.G.] before anybody. She was the first to know." This happened in late April 2014, when K.G. was around 14 or so; she remembered the date because her grandmother had passed away around that time.

After that point, Garcia's conduct "got more serious." All the kids slept on the living room floor in the Austin Street house. K.G. told Angelica Limon, the forensic interviewer: "He would take off the blanket and I would wake up to him like trying to reach into my – in my pants. Well it would – I would wear sweat – I wear sweat pants to sleep and ... I woke up like various times like him trying to put his hand down there. And

8.

I like would wake up and be like, 'What the fuck are you doing?' " K.G. would move his hand away. Garcia would tell her to be quiet because all the kids were sleeping in the same room.

After K.G.'s mother died, Garcia started going out to bars regularly at night. When he came home at 2:00 or 3:00 a.m., he played loud music and would try to touch K.G. as she slept, including by "going slowly and slowly downwards" over her "butt cheeks." K.G. recalled, "[H]e would try touching me every single time he would come back from the bar." When K.G. would awaken, she would say, " 'What the hell? Go to sleep,' " but Garcia would order her to get up and heat up his food. This was the pattern on weekends because that was when Garcia went out to bars.

In her forensic interview, K.G. described other incidents and occurrences of sexual abuse by Garcia that were consistent with what she had told Officer Sisemore and Veronica Pleitez. For example, when K.G. asked for money, Garcia would tell her she had to do something in exchange, while giving the "nastiest looks towards [her] body." Garcia asked K.G. to "jack [him] off" and when she refused, he took her underwear and masturbated into it.

K.G. told Angelica Limon that the abuse continued at the Daulton Street house. Garcia would approach K.G. and grab her breasts under her clothes. He would smack her butt and grab her private parts. K.G. recalled, "[H]e would claim to be tickling me. He would use that to touch me." Garcia would move his penis up and down in his pants and try to show that to K.G. On a few occasions, Garcia masturbated in his bedroom, invited K.G. into the room, and told her to watch. He instructed K.G., " 'Look,' " and then squeezed his penis so that ejaculate came out of the tip. He asked K.G. to have sex with him and to let him touch her breasts. K.G. was disgusted and refused.

Garcia showed K.G. cards with pornographic pictures on them and asked whether she wanted to watch porn videos. He offered to let her stay home from school should she agree to watch porn videos with him. When K.G. was watching television in the living

9.

room, Garcia announced, " 'Look, the pants don't fit me,' " and dropped his pants revealing his penis. He revealed his penis to K.G. multiple times. Angelica Limon asked K.G.: "And what did it look like? His penis what did it look like?" K.G. said: "It's just dark. Ew it's disgusting. It's dark and then it wa-expanding it when he would do that."

K.G. noted that the worst thing that ever happened to her was when Garcia pulled down her PE shorts and underwear at the Austin house when she was 13 years old. K.G. quickly pulled them up and demanded, " 'Why do you do shit like this to me?' " Garcia, who had been staring at K.G. the entire time, laughed and walked away. K.G. explained why this was the worst thing she endured: "[H]onestly my mom like when she raised me she taught me like to have self-respect. And I felt like when he did that like he took that away from me. Because he had seen all my body."

In the summer of 2014, Garcia and V.G. got into an argument over Garcia's misconduct with K.G. Garcia tried to choke V.G. and V.G. punched Garcia in the face.

The last time Garcia made an advance on K.G. was the night before she reported him to the police. Garcia slapped her butt when K.G. was washing dishes.

### (iii) Follow-up Investigation

Maria Maravilla, a Madera County Child Protective Services social worker, met monthly with K.G. after she was removed from her father's custody. Maravilla recalled that "something that stands out is that she really didn't want to go home." Maravilla noted in a report dated August 16, 2015, that K.G. did not want to go home and was worried about her little sister. K.G. said that Garcia had apologized to her in front of the family for the sexual abuse that had occurred. Garcia called K.G. two times per month, but K.G. did not feel comfortable having contact with him.

Jerica Ramos, another social worker for Madera County Child Protective Services during the relevant period, also testified for the prosecution. In March and April of 2016, Ramos worked with K.G. and her younger siblings. She had several contacts with K.G. during that period. As reflected in Ramos's contemporaneous notes, in March 2016, K.G.

10.

told Ramos that returning home to her father would upset her and, further, she was worried about her younger sister; K.G. said she would not want her sister to experience the same abuse she did while in the care of their father. In April 2016, as reflected in Ramos's contemporaneous notes, Ramos told K.G. that some relatives had come forward with an interest regarding placement of K.G.'s siblings. K.G. responded she had some concerns regarding her ability to contact her siblings, should they move to live with family, as she felt things had changed since she disclosed the abuse by her father. K.G. further indicated family members had been telling her to not disclose the abuse. Ramos recalled that K.G. had a sad and depressed demeanor during this discussion.

The trial court further permitted Ramos to testify as an expert regarding child abuse investigations, and, more specifically, child sexual abuse disclosures and recantation of child sexual abuse disclosures or allegations. Ramos testified on these topics in her capacity as an expert witness. As to disclosures of sexual abuse by children, Ramos testified: "Usually, a big influence on a child disclosing abuse is a parent that has previously discussed with them what good and bad touch is or how they should or should not be treated. And so when something goes against what their parent has advised them, then they feel safe to tell someone."

On the related issue of recantation of sexual abuse allegations by children, Ramos testified: "Usually, if a child doesn't have another supportive parent or if the abuse happens by a parent or if it's a younger child, they have a higher likelihood of recanting or taking back that statement after they have made it." When asked to summarize the factors that affect "a child recanting a statement of abuse," Ramos stated: "So it could be a number of factors. But the three that I mentioned are usually the highest indicators of a child recanting, that being a younger child, a child who was abused by someone close to them, such as a family member or parent, or a child who lacks family support."

The prosecutor asked Ramos: "And do you have any idea of what percentage of children recant a statement of abuse?" Ramos responded: "So in my experience and

through some of the education that I have had in my career, I know that it's around 20/23 percent of children who recant." The prosecutor further asked Ramos: "So if a child recants the allegation of abuse, could it be that [the abuse] actually happened?" Ramos answered: "Yes. It's possible, yes." The prosecutor next asked: "And could it be that [the abuse] actually didn't happen and the recantation is true?" Ramos answered: "Yes."

Sergeant Alicia Keiser of the Madera Police Department also testified for the prosecution. Sergeant Keiser investigated K.G.'s allegations. She talked to several family members and also spoke with K.G. Sergeant Keiser testified: "K.G. called me a couple times in concern with the family trying to contact her and, at one point, contacting her during [dependency] court, telling her that she needed to lie about what she was saying and that – to stop talking about this and to let it go. And she was very concerned with them contacting her and trying to tell her not to make the police involved." K.G. called Sergeant Keiser in this regard "after the [October 9, 2014] original forensic interview in the beginning of the investigation," and again in April 2016, on "the day that she had gone to family court for the custody issues that they were going through."

## C. K.G.'s Trial Testimony

K.G. recanted her allegations of sexual abuse against Garcia, in her trial testimony (see below).

K.G. described her childhood growing up in and attending schools in Madera. After her mother's death, K.G. became lonely, depressed, and suicidal. K.G. hid her feelings and took over the typical "mother" duties in the household, such as cooking, cleaning, and caring for her younger siblings. K.G.'s father sold cars and the family received food stamps and government assistance.

When the children were growing up, K.G.'s mother was the one primarily caring for the five children. K.G. only spent time with her father on Sundays. K.G. saw her dad drinking excessively and then "go out and waste his money." This caused many fights between her parents. Around 2010, K.G.'s father got sick with diabetes and stopped

12.

drinking. Afterwards, he mostly stayed at home and worked infrequently. Upon her mother's death, K.G. hated her father because she thought stress that he had caused her mother led to her illness and death.

After her mother died, K.G. would see Garcia drinking secretly and thought he was doing it as a coping mechanism. He went to bars regularly. He would come home at 2:00 or 3:00 a.m., wake everyone up, and demand that K.G. make food for him. Garcia was "aggressive" with K.G.

Garcia mentioned the possibility of bringing new women into the children's lives, making K.G. "livid" and "[f]urious." K.G. did not want anyone taking her mother's place. She was also dealing with a hatred toward her father because she thought it was his fault that her mother was taken from her. K.G. was frustrated and angry that while her father was going out, trying to have a good time, and meet someone new, K.G. was not allowed to be a kid. After her mother passed away, Garcia "expected more" from K.G. But she just wanted to be a typical teen and hang out with friends and go to movies and parties.

K.G. testified that when she was approximately 14 years old, she went to the police and reported that Garcia was sexually abusing her. She explained she fabricated the allegations that Garcia had sexually assaulted and molested her. K.G. was angry and resentful, and hated Garcia. She felt he took her mom away from her and she wanted to make him pay for that and to destroy him. K.G. got the idea to fabricate the allegations because a girl she had known in the sixth grade had been physically and sexually abused. That girl was removed from her household by authorities and placed in foster care; she told K.G. about the system and how it worked.

K.G. clarified Garcia had never sexually abused her and her prior allegations were not true. She had lied to the police, the forensic interviewer, and various social workers about sexual abuse committed by Garcia. Garcia never showed her his penis; she just described what she had seen in a biology textbook or presentation. Garcia never showed

13.

her pornography; she had only seen pornographic magazines around the house. When people in town found out about her allegations, K.G. was embarrassed and felt badly that people were saying bad things about Garcia.

K.G. acknowledged she went through counseling after she was removed from Garcia's care, but she never told her counselors or social workers that her allegations were untrue. K.G. further acknowledged that in 2014 and 2015 she had told Jerica Ramos that Garcia's family was telling her to recant. K.G. explained she did not recant her allegations at those points because she was scared she would be punished and locked up.

K.G. acknowledged she told Veronica Pleitez, the social worker, that she was concerned about B.G., her nine-year-old sister, going back to Garcia's house; K.G. explained her concern was that she wanted B.G. to have a childhood and not be burdened by onerous household duties. K.G. said she was not motivated by any concern that Garcia would molest B.G. As for her statement to Maria Maravilla that she did not want to have contact with Garcia, K.G. explained she said that because she felt badly about lying. K.G. also explained why she was recanting her allegations at trial and had not done so previously: "Well, I am also much older. My dad has become part of our lives. We need him. We don't have our other parent. And despite everything he's done, we want our dad."

## D. Other Witness Testimony

Maria B., who lived with Garcia's brother, Fernando, testified for the prosecution. When V.G. hit Garcia, V.G. and K.G. came to live at the house of Fernando and Maria B. A week later, Garcia told Maria B. that he had asked his children to clean the house, V.G. got angry, and punched Garcia in the eye. K.G. stayed with Maria B. for about a month before returning to the Daulton Street house she shared with her father and siblings.

The prosecution also called V.G., K.G.'s older brother, as a witness. V.G., who is two years older than K.G., was 22 years old at the time of his testimony. Their mother's

14.

death was hard on the family and changed the household dynamic dramatically. K.G. took over the majority of the household chores. Garcia would go out drinking until late at night. At some point after their mother died, V.G. got into a physical altercation with Garcia and then moved out of the house. V.G. wanted to do his own thing and did not want to follow his father's rules. He hit Garcia in the face when Garcia tried to discipline him.

Afterwards, V.G., K.G., and their three younger siblings moved in with Maria B., their aunt. V.G. had told his cousins that he punched his father because of what he was doing to K.G. V.G. later took K.G. to the police station to report that Garcia had molested her. V.G. had believed K.G. when she told him that Garcia had touched her sexually. V.G. did not recall confronting Garcia about K.G.'s allegations of abuse. V.G. testified that the statements he made to CPS social worker Veronica Pleitez at the Madera Police Department were lies.

The prosecution called M.G., one of Garcia's 12 siblings, as a witness. M.G. believed K.G.'s molestation accusations against Garcia were all lies. She was of the view that K.G. made up the allegations because Garcia had scolded her after finding her alone with a boyfriend. M.G. had attended an April 11, 2016 family court proceeding to support Garcia. M.G. had spoken with K.G. after court and had asked her to tell the truth, because it was unfair that K.G.'s siblings were separated from their father because of K.G.'s allegations. M.G. opined that Garcia "would never do anything like that."

M.G.'s daughter, C.G., was also called as a witness by the prosecution. C.G. is two years older than K.G. and they were really close, like sisters, growing up. C.G. testified that K.G. "was always a smart person in school, even in elementary [and through] high school, all throughout." A few weeks before K.G. got in touch with law enforcement, K.G. told C.G. that her father was touching her inappropriately. C.G. testified: "[When K.G. visited] my house, we would be in my room talking about whatever has happened and stuff – boyfriend. And then [K.G.] just had said – she started

15.

crying, and I asked her why she was crying. And then she told me that – what I had said, that her dad was touching her." C.G. added: "[S]he started crying uncontrollably, and she didn't really say much. And I was, like, 'I'm going to tell my mom,' and she was like, 'No, don't say anything.' "

## E. Defense Case

Garcia testified in his own defense; he was the only witness to testify in the defense case. Garcia testified that he never touched K.G. inappropriately and denied committing the alleged acts. He testified he never offered her money for sex, exposed his penis to her, ejaculated into her underwear, masturbated in front of her, or asked her for sex or to engage in sexual acts. He never showed K.G. pornographic photos, never asked if she wanted to watch porn videos with him, and never told her that she could skip school if she watched porn with him at home. He never touched her vaginal area.

After Garcia's wife unexpectedly died, the family struggled. V.G. no longer obeyed, refused to do chores, and would go out with his friends all the time. K.G. had more chores than V.G. She did laundry, made food, cleaned the house, and helped her younger siblings. K.G. went out with her friends regularly and began smoking marijuana. Garcia scolded her and K.G. got angry. Garcia also made K.G.'s boyfriend go away, which upset her as well.

Garcia only came home drunk once and he did not molest K.G. K.G. lied about him molesting her because she was angry with him.

## DISCUSSION

### I. The Trial Court Properly Considered the Original New Trial Motion Instead of the Post-Remand New Trial Motion

*Additional Background*

On November 14, 2019, before the first appeal, defendant filed a motion for new trial. In *Garcia I*, we held the trial court applied the wrong standard in considering that motion, and remanded "for the trial court to rule on Garcia's motion for new trial under

16.

the correct legal standard." (*Garcia I*, *supra*, F082051.)  For separate reasons, we vacated the sentence and remanded for resentencing.  (*Ibid.*)  We affirmed the judgment "in all other respects."  (*Ibid*.)

Nothing in our disposition of *Garcia I* permitted or contemplated additional motions on remand.  Nonetheless, on remand from *Garcia I*, Garcia filed another motion for a new trial on the grounds that the verdict was contrary to the evidence.  He argued that, given K.G.'s recantation, there were two reasonable conclusions that could be drawn from the evidence, one of which was innocence.

The trial court denied the motion.  In its ruling, the trial court observed that appellate cases have held that courts are either without jurisdiction to consider a second new trial motion or that such motions are generally prohibited.  The trial court concluded that because *Garcia I* directed the trial court to apply the correct standard to the *original motion*, the second new trial motion was "redundant."  Accordingly, the trial court proceeded only with respect to the original new trial motion.

Garcia contends the court should have considered his second motion for a new trial.  We conclude the trial court's approach was correct.  In *Garcia I*, we remanded solely for the court to reconsider the original new trial motion and for resentencing.  We affirmed the judgment in all other respects.  This left no room for other law and motion activity, such as a second new trial motion.  While the word "redundant" might not have precisely captured this issue, the context made clear the basis for the court's ruling.

Garcia emphasizes that our disposition did not prohibit another motion for new trial.  However, "the trial court's jurisdiction on remand extends only to those issues on which the reviewing court *permits* further proceedings.  [Citations.]  The trial court may not expand the issues on remand to encompass matters outside the scope of the remittitur merely because the reviewing court has not expressly forbidden the trial court from doing so."  (*Ayyad v. Sprint Spectrum, L.P.* (2012) 210 Cal.App.4th 851, 863, fn. omitted.)

17.

Garcia also states that because the judge presiding over post-remand proceedings was not the trial judge, he "had the right" to submit a new motion. He cites no legal authority for that proposition, and we find it meritless. (See *People v. Moreda* (2004) 118 Cal.App.4th 507, 512-515.) Indeed, in arguing a separate issue, Garcia recognizes that he was not entitled to demand the same judge preside on remand *and that trial courts can effectively rule on a new trial motion by reviewing the proceeding's transcripts.*

Finally, Garcia contends the trial court's approach violated his Sixth Amendment right to counsel and his Fourteenth Amendment right to due process. But he only offers a collection of case citations without any analysis applying the cited legal principles to the facts of his case. Because this contention was not sufficiently developed, we find it forfeited. (See, e.g., *People v. Stanley* (1995) 10 Cal.4th 764, 793.)

## II. The Proper Standard of Review is Abuse of Discretion

Denial of a new trial motion is reviewed for abuse of discretion. (*People v. Hin* (2025) 17 Cal.5th 401, 498.) Garcia argues that his case is "exceptional" and warrants de novo review. He contends that de novo review should apply since the judge had no personal observations of witness demeanor, and "simply conduct[ed] legal analysis based on review of the record proceedings." However, a trial court's personal observations of witness demeanor is not the sole reason for deferential appellate review. The actual decision of whether to grant a new trial is a discretionary one committed to the superior court's judgment.

"A trial court has broad discretion in passing upon a motion for a new trial made on the ground that the verdict is contrary to the evidence and its action in denying the motion will not be disturbed on appeal unless it clearly appears that it abused such broad discretion." (*People v. Richard* (1951) 101 Cal.App.2d 631, 634.) Indeed, "a trial court in a criminal proceeding is vested with so wide a discretion in the matter of passing upon a motion for a new trial that its action in granting the motion will be disturbed only when there is a clear showing of a manifest and unmistakable abuse of such discretion." (*Ibid*.)

18.

Cases have held that "a motion for a new trial on the ground that the verdict is contrary to the evidence presents an issue to the trial court upon which an appellate court cannot pass; that an appellate court cannot appraise the weight of the evidence and can only review it for its legal sufficiency; that the trial court in ruling upon a motion for a new trial is not bound by conflicts in the evidence and that while the solemn verdict of a jury should not lightly be vacated, a responsibility, nevertheless, rests with the trial court again to review the cause and only after such review to decide the application for a new trial." (*Ibid*.)

Since de novo review would disregard the discretionary nature of the decision being challenged, we will apply the standard abuse of discretion standard.

**III.    Garcia Has Not Established an Abuse of Discretion by the Trial Court**

In ruling on a new trial motion, the trial court "independently examines all the evidence to determine whether it is sufficient to prove each required element beyond a reasonable doubt to the judge." (*Porter v. Superior Court* (2009) 47 Cal.4th 125, 133, italics omitted.) "If the court is not convinced that the charges have been proven beyond a reasonable doubt, it may rule that the jury's verdict is 'contrary to [the] ... evidence.' " (*Ibid*.)

We review the trial court's ruling for abuse of discretion. (*People v. Hin*, *supra*, 17 Cal.5th at p. 498.)

*Analysis*

In terms of the underlying merits of the trial court's denial of a new trial, Garcia makes a rather brief argument. He contends that the trial court abused its discretion because it described K.G.'s prior accusatory statement as "testimony," when in fact the accusations were out-of-court statements to family members, law enforcement, etc. (i.e., were not "testimony.") Specifically, Garcia points to this statement from the court's ruling: "The inconsistencies in the testimony denying that the offenses occurred and the strong evidence that the family pressured [K.G.] to recant *her prior testimony* from the

investigation convincingly proves that *the recantation* is false and that the original allegations were true." (Italics added by Garcia.) He posits that the distinction between testimony and other types of statements is important because only testimony is made under oath, carries the penalty of perjury, and is made in circumstances "impressed … with the seriousness of the matter."

It is true that K.G.'s prior allegations of abuse were not "testimony," but rather out-of-court statements made to family members, law enforcement, social workers, etc. But this brief, semantic imprecision in the court's ruling does not establish an abuse of discretion. Elsewhere, the ruling describes in-depth K.G.'s prior accusations and makes clear the court understood the contexts in which they were given (e.g., a forensic interview, statements made to a cousin, etc.) So, while K.G.'s prior accusations were not literal "testimony," other aspects of the ruling make clear the court understood that fact. Consequently, we find no abuse of discretion.

## DISPOSITION

The judgment is affirmed.

HARRELL, J.

WE CONCUR:

HILL, P. J.

MEEHAN, J.

20.